UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROD ROY WALSH,

      Plaintiff,                    Civil Action No.  17-12812

v.                               HON. VICTORIA A. ROBERTS
                               U.S. District Judge
                               HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL      U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Rod Roy Walsh ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Dock. #17] be GRANTED and that Plaintiff's Motion for Summary Judgment [Dock. #13] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB on May 17, 2014 alleging disability as of September 13, 2011 (Tr. 167).  After the initial denial of benefits, Plaintiff requested an administrative

hearing, held on February 26, 2016 in Detroit Michigan before Administrative Law Judge

("ALJ") Crystal L. White-Simmons (Tr. 32).   Plaintiff, represented by Kate Gorski, testified

(Tr. 39-60), as did Vocational Expert ("VE") Diane Regan (Tr. 60-65).   On June 10, 2016,

ALJ White-Simmons found Plaintiff not disabled (Tr. 15-26).   On July 7, 2017, the Appeals

Council declined to review the administrative opinion (Tr. 1-3).   Plaintiff filed for judicial

review of the final decision on August 25, 2017.

## II.  BACKGROUND FACTS

Plaintiff, born July 13, 1975, was 40 at the time of the ALJ's decision (Tr. 26, 167).

He completed 12th grade and worked previously as a home health care aide, construction

worker, production worker, and resident care aide at a state hospital (Tr. 184).   He alleges

disability due to depression, anxiety, bipolar disorder, and Attention Deficit Disorder

("ADD") (Tr. 183).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced her client's testimony by noting that he also experienced*

*osteomyelitis causing "full exposure" of the right foot bones, osteoarthritis, and*

*fibromyalgia* (Tr. 38-39).

Plaintiff, right-handed, stood 6' and weighed 250 pounds (Tr. 39).   At the time of the

hearing, he was separated and lived with his father in a two-story home in Bad Axe,

Michigan (Tr. 39-41).   Plaintiff avoided going upstairs or using the basement due to the

exposed bone of his right toe (Tr. 41). His income was limited to a bridge card (Tr. 41).   He

had state-sponsored health insurance (Tr. 41).  He held a valid driver's license and was able to drive up to 90 minutes at a time (Tr. 42).  He did not graduate from high school until the age of 20 due to a learning disability and depression (Tr. 42).  He had not been placed in special education classes (Tr. 42).  When he was 22, he passed the prerequisite classes to begin study for a nursing degree but abandoned his studies due to depression and stress (Tr. 43).

Plaintiff stopped working in September, 2011 after experiencing an April, 2011 "breakdown" (Tr. 43-44).  He received inpatient psychological treatment during which time he attempted suicide (Tr. 43).  He was diagnosed with bipolar disorder (Tr. 43).  He noted that his employer was "willing to work with [him]" provided that he sought additional inpatient treatment, but that he instead "barricaded" himself in his apartment and did not interact with anyone (Tr. 44).  He later returned to work but had problems interacting with a new "clientele" and as a result "abandoned" his job (Tr. 44).

Plaintiff's former work as a residential care aide included restraining combative patients (Tr. 45).  He also helped patients with their activities of daily living and accompanied them to treatment (Tr. 45).  On occasion, his work required him to lift heavy patients (Tr. 45).  He spent most of the workday on his feet (Tr. 45).  In addition to the aide work, he also performed production work for four years (Tr. 47).  He also performed construction work consisting of painting and installing drywall (Tr. 47-48).  It took him around eight months to learn how to install drywall (Tr. 48).  The drywall position required

him to lift up to 50 pounds (Tr. 48).

Plaintiff was unable to work due to the medication side effects of fatigue, lethargy, and drowsiness (Tr. 49). He also experienced chronic body pain and intense pain from the toe condition and plantar fasciitis (Tr. 49). The toe condition began sometime in the first half of 2015 and was not getting better (Tr. 49-50). The pain was exacerbated by walking and standing (Tr. 50). He also experience pain while sitting (Tr. 50). On a scale of one to ten, he experienced level "six to seven" right foot pain (Tr. 50). Pain medication did not relieve the foot discomfort (Tr. 51). In addition, Plaintiff experienced back pain, joint pain, and fibromyalgia (Tr. 51). Plaintiff believed that the fibromyalgia diagnosis had been confirmed with a blood test (Tr. 51).

Plaintiff received psychiatric treatment once every two months and met with a therapist twice a month (Tr. 51-52). He had not been hospitalized since 2011 (Tr. 52). He sought emergency treatment on one occasion after failing to take his psychotropic medications correctly (Tr. 53). He was unable to walk for more than half a block, lift more than eight pounds, and experienced problems kneeling, crouching, and bending (Tr 54). He did not experience manipulative limitations (Tr. 55). His household chores were limited to cooking simple meals and doing the laundry once a week (Tr. 55). He neglected his personal hygiene when he was depressed (Tr. 56). As part of his therapy, Plaintiff forced himself to socialize at a senior citizens' facility for awhile, but was no longer participating (Tr. 56).

In response to questioning by his attorney, Plaintiff reported that to avoid anxiety, he

wore earplugs while grocery shopping (Tr. 57).  His psychotropic medication prevented manic episodes but made him feel "knock[ed] . . . down" (Tr. 57).  In the past during manic phases, he would stay up for "days," would become excited and angry, and did not have a grip on reality (Tr. 58).  During depressive phases which occurred five days a week, Plaintiff lacked motivation and spent significant portions of the day staring at the television (Tr. 58).  He was socially isolated (Tr. 58). Despite his condition, Plaintiff took his medication regularly and attended doctor and therapy appointments (Tr. 59).  He reiterated that the right toe condition caused constant pain and required him to elevate the foot several times a day (Tr. 60).

### B.    Medical Evidence[1]

### 1. Records Related to Plaintiff's Treatment

October, 2010 records by family physician Naveed Mahfooz, M.D. show that Plaintiff took Zoloft and Xanax (Tr. 340).  Records from the next month show prescriptions for Adderrol and Klonopin (Tr. 338).  Dr. Mahfooz's records note that Plaintiff was taking Klonopin as of March, 2011 (Tr. 330).

April, 2011 inpatient records by Kingswood Hospital state that Plaintiff expressed

---

[1]

Despite his testimony of significant physical restriction, Plaintiff later submitted a statement for review by the Appeals Council denying any physical limitations (Tr. 264). Likewise here, Plaintiff's bases his arguments for remand exclusively on his psychological condition and does not challenge the ALJ's finding that he could perform sedentary work. The discussion of the treating and consultive records is mostly limited to Plaintiff's psychological limitations.

suicidal ideation at the time of the voluntary admission (Tr. 265). Plaintiff reported that prior to admittance, he became depressed as a result of relationship problems (Tr. 265). Plaintiff reported that he had a total of four children from two relationships and worked overtime to meet his expenses (Tr. 265). He appeared depressed with a normal thought process and average intelligence (Tr. 266). He denied hallucinations (Tr. 266). He reported that he was embarrassed about Facebook entries that had recently become public (Tr. 266). Upon admission, he was assigned a GAF of 20[2] (Tr. 266). A physical examination was unremarkable (Tr. 270). He was discharged five days later with a stabilized mood (Tr. 272). He was diagnosed with depression and Attention Deficit Hyperactivity Disorder ("ADHD") and assigned a GAF of 45[3] (Tr. 272).

May, 2011 records by Barry Binkley, M.D. state that Plaintiff's psychological functioning was mildly impaired with a normal thought process (Tr. 284). The same month, Dr. Mafooz noted a diagnosis of ADD and bipolar disorder (Tr. 326). In July, 2011, Plaintiff was transported to the emergency room by police after he was found to be "rambling with paranoid ideation" (Tr. 292). Dr. Binkley's records from the next week note work-related stressors (Tr. 287). Dr. Barry's September, 2011 discharge summary states that Plaintiff

---

[2]A GAF score of 11–20 indicates "some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM–IV–TR*"), 34.

[3]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV* at 34.

failed to show up for appointments for more than 30 days (Tr. 289).

In December, 2011, Plaintiff sought an emergency psychiatric evaluation, stating that he did not believe his psychotropic medication was working (Tr. 278). He reported that he experienced stress as a result of recently losing his job (Tr. 278). He was diagnosed with bipolar disorder and depression exacerbated by the recent job loss (Tr. 280). He was discharged with instructions to follow up with Dr. Mahfooz (Tr. 280).

In January, 2012, Plaintiff again received emergency treatment after accidently ingesting an overdose of Seroquel (Tr. 302, 348). Dr. Mahfooz's records from the same month note that he continued to prescribe psychotropic medication (Tr. 314). Dr. Mafooz continued to prescribe psychotropic medication from February, 2012 to February, 2013 (Tr. 392-402). March, 2012 psychological intake records note Plaintiff's report of stress due to not seeing his children (Tr 364). He rated his overall physical health as good (Tr. 366). He reported taking Xanax and Prozac (Tr. 366). Plaintiff identified "problems with his spouse" as a "severe" problem (Tr. 367). He denied the current use of alcohol (Tr. 370). Plaintiff appeared fully oriented with a normal thought process (Tr. 372). Areas of concern were depression/anxiety, legal issues, and substance abuse issues (Tr. 373). In May, 2012, he was discharged from treatment for lack of attendance (Tr. 375). In July, 2012, Plaintiff sought emergency treatment after experiencing symptoms of mania including insomnia and flight of ideas (Tr. 353). He reported that he had run out of medication three weeks earlier (Tr. 353-354). Treating records note that he was under stress due to a home foreclosure and his

car being in repossession (Tr. 358).   Records from the same month noting that Plaintiff was currently jailed for the destruction of state property and that depression was a "serious" problem (Tr. 381-382).  Plaintiff also reported sleep deprivation (Tr. 382).  Plaintiff reported that he was currently employed at a warehouse (Tr. 382).  He was diagnosed with bipolar disorder and assigned a GAF of 55[4] (Tr. 383, 386).  Notes by Harun Al Rashid, M.D. from the following month state that Plaintiff denied delusions (Tr. 384).  October, 2012 records note that plaintiff was fully oriented with a normal mood and affect (Tr. 389).

January, 2013 psychological intake records by Dr. Usha Movva note Plaintiff's report that he usually got along with his wife (Tr. 407).  He reported that his regular activities included getting exercise and doing household chores (Tr. 407).  He reported an interest in tennis, golf, and going for walks with his wife (Tr. 407).  He denied learning problems while in school (Tr. 408).  He denied problems sleeping (Tr. 409).  He denied "serious" psychological problems (Tr. 409).  The assessment notes a constricted affect and "mild to moderate grandiosity" (Tr. 410).  Dr. Movva assigned him a GAF of 50 with bipolar disorder and antisocial personality traits (Tr. 414, 416).  Dr. Movva's records from the following month note that Plaintiff reported a "much better" mood (Tr. 418, 492).  Plaintiff reported "'a pretty healthy lifestyle'" and good social skills (Tr. 420).  He was given a fair prognosis (Tr. 420).   April, 2013 records note a diagnosis of ADD, anxiety, and manic-depressive

---

[4]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM–IV–TR*, 34.

psychosis (Tr. 504, 531, 658).  The same month, Plaintiff asked Dr. Mafooz for medication to address ADD (Tr. 481).

Dr. Mahfooz's October, 2013 records note Plaintiff's request for medication refills but that he had "no other concerns" (Tr. 500).  November, 2013 intake records note that Plaintiff reported an increase in symptoms in the previous September (Tr. 422, 921).  He reported that he was currently getting Seroquel, Topamax, and Visceral from Dr. Mahfooz (Tr. 425).  Plaintiff identified mood swings, anxiety, and suspiciousness as serious problems (Tr. 425).  Plaintiff declined to pursue psychiatric services because he was receiving medication from Dr. Mahfooz (Tr. 932).

Dr. Mahfooz's January, 2014 records note Plaintiff's report of "seasonal" depression (Tr. 498,  583, 624, 817).  Counseling records state that Plaintiff was currently looking for work but also "working on getting [DIB]" (Tr. 936, 938).  The following month, Dr. Mahfooz denied Plaintiff's request for an early refill of Ritalin (Tr. 462, 497).  Treating records note that the depression appeared "seasonal" (Tr. 496, 581, 622).  In April, 2014, Dr. Mahfooz completed an assessment of Plaintiff's mental condition, noting the conditions of bipolar disorder, anxiety, and depression (Tr. 451, 805-806).  Dr. Mahfooz found that Plaintiff experienced problems in memory, concentration, and social interaction and that the condition of bipolar disorder was "deteriorating" (Tr. 451-452).

The same month, intake records by psychiatrist Mohammad Jafferany, M.D. note Plaintiff's report of mood swings, depression, and focusing (Tr. 569).  Plaintiff reported that

his current medications were helping the conditions of ADHD and depression (Tr. 569).  Dr. Jafferany noted that Plaintiff's description of symptoms was "suggestive of bipolar disorder" (Tr. 569).  Plaintiff reported that his condition was currently stable (Tr. 569).  He was assigned a GAF of 55 due to the mental conditions and osteoarthrosis (Tr. 574).  Counseling records from the same month state that Plaintiff experienced stress due to missed child support payments and the fear of going back to jail (Tr. 946).  June counseling records note a stable mood following a resolution of Plaintiff's legal issues (Tr. 949).  He denied medication side effects (Tr. 951).

In July, 2014, Dr. Mahfooz once again denied Plaintiff an early refill of Ritalin (Tr. 472).  Counseling records note a stable mood and good results from medication (Tr. 953).  Counseling records note the situational stressor of marital problems but that Plaintiff continued to exercise six to seven days a week (Tr. 961).  Dr. Jafferany's September, October, and December 2014 records note "significant improvement" in symptoms with Lamictal (Tr. 551, 557, 563).  He reported good concentration and sleep hygiene (Tr. 563).  In October, 2014, Plaintiff reported that he been attending his son's football games (Tr. 964).  In November, 2014, Dr. Mahfooz completed a medical source statement regarding Plaintiff's physical conditions, opining that Plaintiff was unable to perform even sedentary work (Tr. 897-899).  In December, 2014, Dr. Jafferany noted that Plaintiff denied depression or anxiety (Tr. 551).

In January, 2015, Dr. Jafferany noted that Plaintiff's "symptoms seem to be resolving"

(Tr. 549).  The same month, Dr. Jafferany completed a medical source statement regarding depression, finding that Plaintiff experienced disturbances of mood, loss of interest, appetite disturbances, sleep disturbances, guilt, concentrational problems, and hallucinations, delusions, or paranoid thinking (Tr. 901).  He found extreme limitation in activities of daily living, social functioning, concentration, persistence, or pace, and episodes of deterioration or decompensation (Tr. 903).  Dr. Jafferany found that when Plaintiff was in a manic state, he experienced hyperactivity, pressure of speech, flight of ideas, inflated self-esteem, sleeplessness, distractibility, and high risk activity (Tr. 902).  Counseling records from the same month note that Plaintiff got along well with his family, had a good friend living next door, and exercised and watched sports regularly (Tr. 913).  He was assigned a GAF of 45 due to depression, alcohol dependence, and economic and occupational problems (Tr. 919).  On a scale of one to ten, Plaintiff rated his depression at "three to four" (Tr. 974).  March, 2015 counseling records note a stable mood with no medication side effects (Tr. 981).  Dr. Mahfooz's March, 2015 records note a diagnosis of ADD but not depression, bipolar disorder, or anxiety (Tr. 653).  Dr. Jafferany's March and May, 2015 records note "no psychiatric complaints," mood swings, or anger problems (Tr. 545, 547).  Dr. Mahfooz's May, 2015 record state that Plaintiff received pain relievers for muscle aches and a toe infection (Tr. 753-754).  The following month, Dr. Mahfooz deemed Plaintiff a moderate risk for opioid abuse based on his psychiatric history and age (Tr. 738).  The same month through December, 2015, Dr. Mahfooz noted the "active problems" of anxiety, ADD, and bipolar

disorder (Tr.609- 615).  He prescribed Norco and Motrin for pain management (Tr. 731-732).

In August, 2015, Dr. Jafferany noted that Plaintiff seemed "to be recovering" (Tr. 543).

Despite the existence of an infected toe, Plaintiff continued to exercise regularly (Tr. 543).

Counseling records from the next month note a "moderate" mood (Tr. 1012). An October,

2015 discharge summary by Dr. Movva states that over the course of treatment, Plaintiff

"gained stability and decreased symptoms of depression, anxiety, [and] anger" (Tr. 907,

1017).  Plaintiff denied medication side effects (Tr. 907).  October, 2015 records by

counseling services close to Plaintiff's new home assigned him a GAF of 40 due to

depression, anxiety, bipolar disorder, and occupational, housing, and legal problems[5] (Tr.

1030).  Plaintiff, noting that he had an upcoming administrative hearing, stated that he

needed "to seek therapy" in order to receive DIB (Tr. 1023).

December, 2015 counseling records note that Plaintiff had a good holiday but was

planning to separate from his wife (Tr. 990).  December, 2015 and January, 2016 records

related to treatment for the toe condition note that Plaintiff denied depression, sadness,

confusion, or a change in memory (Tr. 874, 886, 894-895).  He appeared alert, fully oriented,

pleasant, and cooperative (Tr. 874, 886).  January, 2016 records note "mild[]" anxiety (Tr.

874).

In February, 2016, Dr. Mahfooz completed an evaluation of Plaintiff's psychological

---

[5]A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM–IV–TR*, 34.

conditions of bipolar disorder, anxiety, and depression (Tr. 1040). He noted the symptoms of loss of interest, decreased energy, guilt, concentrational problems, vigilance, and recurrent obsessions or compulsions (Tr. 1041). He found moderate limitation in activities of daily living and social functioning and marked limitation in concentration, persistence, or pace (Tr. 1042). He found that Plaintiff experienced one to two episodes of decompensation every year (Tr. 104). He found moderate limitation in remembering work-like procedures and found that Plaintiff was unable to concentrate for more than 15 minutes at a time, would not maintain regular attendance, and required enhanced supervision (Tr. 1043). Dr. Mahfooz found that Plaintiff could work with the general public, coworkers, and supervisors "sometimes, but not consistently" (Tr.  1043). He found that Plaintiff was socially appropriate but would "sometimes" have problems adapting to workplace changes (Tr. 1044). He found that Plaintiff would be off task over 25 percent of the day and would miss four days of work each month (Tr. 1044).

The same month, Dr. Jafferany completed an assessment, finding that Plaintiff had a fair prognosis (Tr. 1046). He noted that as a result of depression, bipolar disorder, and anxiety, Plaintiff had moderate limitation in activities of daily living and social functioning and marked limitation in concentration, persistence, or pace (Tr. 1048). He found mild limitation in short term memory and moderate limitation in remembering work-like procedures and carrying out detailed instructions (Tr. 1049). He found that Plaintiff could concentrate for up to 30 minutes at one time but would not maintain regular attendance and

would require enhanced supervision (Tr. 1049).   He found that Plaintiff could work with the general public, coworkers, and supervisors "sometimes, but not consistently" (Tr. 1049-1050).   He found that Plaintiff was socially appropriate but would "sometimes" have problems adapting to workplace changes (Tr. 1050).   He found that Plaintiff would be off task over 25 percent of the day and would miss three days of work each month (Tr. 1050, 1056).

### 2.  Consultative and Non-Examining Sources

In August, 2014, Marianne Goergen, Psy.D. performed a psychological examination on behalf of the SSA, noting Plaintiff's report of a psychiatric hospitalization at Kingswood psychiatric facility three-and-a-half years earlier (Tr. 534).  Plaintiff also reported that one-and-a-half years earlier, he lost his temper and punched out a police car window while in a manic state (Tr. 534).  Plaintiff reported social anxiety in crowds but denied panic attacks (Tr. 534).  He noted that he experienced arthritis and possibly fibromyalgia, noting that the arthritis was attributable to excessive exercise in his 20s and early 30s (Tr. 534).  He reported that in his most recent job, he helped patients with activities of daily living and that he had been suspended after missing shifts (Tr. 535).  He reported that he had been married to his second wife for over two years (Tr. 535).  He noted that his sister and parents were supportive (Tr. 535).  He reported that he continued to walk and ride his bike for his "'mental health'" (Tr. 535).

Dr. Goergen noted that Plaintiff was able to bike to the consultative examination and

-14-

showed no abnormalities in posture or gait (Tr. 535).  She observed decreased self-esteem but "intact contact with reality" (Tr. 536).  He exhibited an anxious mood and flat affect but normal thought content (Tr. 536).  Dr. Goergen diagnosed Plaintiff with social anxiety and bipolar disorder with the physical condition of arthritis of the knees and joints (Tr. 537).  She assigned him a GAF of 45-50, concluding that Plaintiff would "likely would work best with smaller amounts of people, introduced slowly as to avoid excessive anxiety.  Once he becomes comfortable, he may be able to handle more complex tasks with minimal supervision"  (Tr. 537).

The following month, Robert Newhouse, M.D. performed a non-examining review of the treating records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 72-75).   He observed that Plaintiff's own report of limitation pertained mostly to his physical limitation, also noting that Plaintiff alleged significant limitation in *all* exertional and non-exertional activity (Tr. 75, 200).

### C.    Vocational Expert Testimony

VE Regan classified Plaintiff's past work as a home health aide as semiskilled and exertionally medium (medium to heavy as performed); drywall installer, skilled/very heavy; and painter, skilled/medium[6] (Tr. 61-62).   The ALJ then posed the following set of

---

[6]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or

limitations to the VE, describing a hypothetical individual of Plaintiff's age, education, and work background:

> [A]n individual [] limited to a medium exertional level . . . except that they can only occasionally climb ladders or scaffolds, frequently climb ramps or stairs, frequently balance, stoop, kneel, crouch and crawl, no unprotected heights, work related to simple and routine tasks with only occasional interaction with the public, co-workers and supervisors. Can this individual perform any of the past jobs? (Tr. 62).

The VE testified that the above restrictions would preclude all of Plaintiff's past relevant work but would allow for the unskilled, medium work of a sorter (200,000 jobs in the national economy); packer (400,000); and machine feeder (200,000) (Tr. 62-63). The VE testified that if the above limitations were amended to limit the individual to light work and preclude the use of ladders, ropes, or scaffolds and only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling, the hypothetical individual could perform the exertionally light work of a packer (300,000); sorter (200,000); and small product assembler (300,000) (Tr. 63). The VE testified that if the individual described in the second hypothetical question were limited to sedentary work, he could perform the sedentary jobs of inspector (100,000); sorter (120,000); and assembler (150,000) (Tr. 63). The VE stated that if the same individual were off-task for at least 20 percent of the workday, all competitive employment would be precluded (Tr. 64). In response to questioning by

---

carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

Plaintiff's counsel, the VE stated that more than one absence a month would be work preclusive (Tr. 64-65).  The VE stated that her job findings were based on Department of Labor information, census publications, manufacturing directories, her own experience doing labor maket surveys, and the *Occupational Outlook Handbook* (Tr. 65).  She stated that her testimony was not inconsistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*"), adding that her testimony pertaining to being off task was based on her own professional experience (Tr. 65).

### D.  The ALJ's Decision

Citing the medical records, ALJ White-Simmons found that Plaintiff experienced the severe impairments of bipolar disorder, osteomyelitis, peridotites of right foot; degenerative disc disease, lumbar disc herniation; arthritis in knees; social anxiety; Buerger's syndrome; and obesity but that none of the conditions met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17-18).  She found that the conditions of fibromyalgia and Attention Deficit Hyperactivity Disorder ("ADHD") were non-severe[7] (Tr. 18).  She found that Plaintiff experienced mild limitation in activities of daily living, social functioning, and in concentration, persistence, or pace (Tr. 19).  The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for sedentary work with the following

---

[7]The ALJ actually stated that the conditions of fibromyalgia and ADHD were "non-medically determinable impairments" (Tr. 18).  However, it appears that read in the context of the entire paragraph, she meant to say that the conditions were medically determinable but non-severe (Tr. 18).

additional limitations:

> [N]o climbing ladders, ropes, scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; no unprotected heights; limited to simple, routine and repetitive tasks with only occasional contact with the public and coworkers/supervisors (Tr. 20).

Citing the VE's findings pertaining to sedentary work, the ALJ found that Plaintiff could work as an inspector, sorter, and assembler (Tr. 26, 63).

The ALJ discounted Plaintiff's allegations of limitation, noting that his self-reported activities of daily living at the time of his application included going to the gym, bike riding, and driving (Tr. 22). She observed that Plaintiff was noted to be cooperative and fully oriented during a consultative examination (Tr. 22). She cited February, 2014 records stating that Plaintiff's depression was seasonal (Tr. 23). She cited an October, 2015 statement that he was in therapy "because he believed it was required" for an award of DIB (Tr. 23). She accorded "very little weight" to Drs. Mahfooz and Jafferany's[8] February, 2016 findings of marked concentrational limitations, noting that "during periods of medication compliance" Plaintiff exhibited a stable mood, and "intact memory, concentration, and fund of knowledge" (Tr. 24).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of*

---

[8]The administrative opinion refers to Dr. Jafferany as "Dr. Jefferany."

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

### A.  The Treating Opinions of Drs. Jafferany and Mahfooz

Plaintiff argues that the ALJ erred by declining to accept the "disability" opinions by both Dr. Jafferany and Dr. Mahfooz.  *Plaintiff's Brief,* 3-24, *Docket #13,* Pg ID 1105.  He contends that the opinions by these sources, a treating psychiatrist and treating family physician respectively, is strongly supported by the findings of other treating sources and Plaintiff's testimony.  *Id.*

 Case law in effect at the time of Plaintiff's application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2)). In the presence of contradicting substantial

evidence however, the ALJ may reject all or a portion of the treating source's findings, *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson,* at 547; 20 C.F.R. § 404.1527(c)(2); SSR 96–2p, 1996 WL 374188, *5 (1996).[9] In explaining the reasons for giving less than controlling weight to the treating physician's opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) the "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson,* at 544.

### 1. Dr. Jafferany's Opinions

As discussed in greater detail in the factual portion of this Report, Dr. Jafferany completed assessments of Plaintiff's condition in January, 2015 (Tr. 901-903) and again in February, 2016 (Tr. 1044-1051).

As a threshold matter, the administrative opinion indicates that the ALJ considered all of the relevant factors in according only "very little weight" to Dr. Jafferany's opinions (Tr. 24). She noted that Plaintiff had received treatment from Dr. Jafferany once every two

---

[9]The administration rescinded SSR 96-2p on March 27, 2017. *See Rescission of Social Security Rulings* 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 17, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 17, 2017." *Hancock v. CSS*, 2017 WL 2838237, at *8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017)). Because current Plaintiff filed his claim well before March 17, 2017, SSR 96-2p applies.

months for "at least a year" (Tr. 21). She noted that Dr. Jafferany was a psychiatrist and that under his care, Plaintiff took the psychotropic medications of Seroquel, Busbar, and Lamictal (Tr. 21). She cited his treating records (Tr. 24).

However, the ALJ discounted Dr. Jafferany's January, 2015 finding of extreme psychological limitation on the basis that it stood at odds with his own treating notes as well as reports by other treating sources (Tr. 24, 549, 903). The ALJ's findings are consistent with my own review of Dr. Jafferany's September through January, 2015 records showing "significant improvement," good concentration, and Plaintiff's December, 2014 denial of any degree of depression or anxiety (Tr. 551, 557, 563). Dr. Jafferany's finding of extreme limitation in activities of daily living, social functioning, and concentration (Tr. 901-903) are grossly contradicted by his treatment records from the same month showing that the psychological symptoms appeared "to be resolving" (Tr. 549).

The ALJ also acknowledged but permissibly rejected Dr. Jafferany's somewhat less extreme February, 2016 finding that Plaintiff experienced marked concentrational problems (Tr. 24, 1046-1051). She noted that Plaintiff's "mental impairments are improved during periods of medication compliance, and he consistently presented with stable mood and intact memory, concentration, and fund of knowledge at his psychiatric reviews," finding that "inconsistencies" between the treating records and the treating opinions "reduce[d] the impact of the latter" (Tr. 24).

The ALJ's finding that Dr. Jafferany's opinions are contradicted by the record is well

supported by the rest of the record.    The record for the period following the alleged
September 13, 2011 onset of disability shows that Plaintiff experienced an exacerbation of
symptoms in December, 2011, January, 2012, and July, 2012.  However, in each case, his
symptoms were found to be respectively attributable to medication dosage problems
combined with situational stressors; an accidental overdose; and the failure to take the
prescribed medication for three weeks (Tr. 278, 280, 302, 348, 353).

The subsequent treating records overwhelmingly reflect at most moderate
psychological limitation.  October, 2012 (normal mood and affect) (Tr. 389); January, 2013
(regular activities included various forms of exercise and household chores); February, 2013
(improved mood with treatment) (Tr. 418, 492); October, 2013 (no significant concerns) (Tr.
500); January, 2014 (depression was "seasonal") (Tr. 498); April, 2014 (bipolar disorder was
"stable") (569); June, 2014 (stable mood following resolution of legal issues and denial of
medication side effects) (Tr. 949-951); July, 2014 (stable moods, good results from
medication) (Tr. 953); October, 2014 through January, 2016 records (able to attend son's
football game, no depression or anxiety, good relations with family, interaction with
neighborhood friend, no medication side effects) (Tr. 549, 551, 557, 563, 907, 913, 964,
1017).  Because the ALJ's rejection of Dr. Jafferany's opinions is well supported and
explained, her findings should remain undisturbed.

### 2. Dr. Mahfooz

For overlapping reasons, the ALJ's rejection of Dr. Mahfooz's findings do not warrant

a remand.   The ALJ prefaced her rejection of Dr. Mahfooz's findings of disabling psychological limitation by noting that he was Plaintiff's "treating physician" and that Plaintiff saw him once a month (Tr. 21).   The ALJ acknowledged Dr. Mahfooz's finding of marked concentrational limitations, the need to be off task for at least 25 percent of the workday, and an absenteeism rate of four times a month (Tr. 24, 1041-1044).   Consistent with her rejection of Dr. Jafferany's opinions, she noted that Dr. Mahfooz's opinion was not supported by the psychological treating records showing a stable mood and no deficiencies in concentration (Tr. 24).   As discussed above, the ALJ's finding that Plaintiff exhibited reduced or no symptoms of bipolar disorder, depression, or anxiety when he took his medication as directed is supported by not only substantial evidence but a preponderance of the evidence.   As such, the ALJ's rejection of Dr. Mahfooz's opinions does not provide a basis for remand.

In a related matter, Plaintiff disputes the ALJ's finding that he experienced only mild limitation in social functioning and concentration, persistence, and pace (Tr. 19), noting that the medical transcript shows at least moderate limitation in these areas. *Plaintiff's Brief* at 23.   However, the ALJ supported her finding of mild social limitations by noting that Plaintiff left the house every day to attend appointments or therapy sessions; did not need reminders to keep appointments; and interacted well with family and neighbors (Tr. 19).   As to the concentrational limitations, the ALJ supported the mild finding by noting that Plaintiff's activities were not significantly hampered by stress or changes in routine and that

-24-

he was able to handle his finances without help (Tr. 19).

As noted by Plaintiff, the finding of mild social and concentrational limitation stands at odds with Dr. Newhouse's non-examining finding of moderate limitation (Tr. 19, 72-75). However, the discrepancy between the non-examining findings and the administrative opinion does not provide grounds for remand. First, the ALJ provided record support for finding that the social and concentrational limitations were mild (Tr. 19). Plaintiff fails to cite any case, statute, or regulation stating that the ALJ is bound by the findings of the non-examining source or that she is not able to assess a claimant's degree of psychological limitation based on the record as a whole. The evidence showing that Plaintiff was able to interact successfully with multiple individuals on a regular basis and the treating records showing the absence of concentrational problems support the ALJ's findings. Second, assuming that the evidence overwhelmingly supports the finding of moderate social and concentrational limitation, the RFC adequately accounts for "moderate" social and concentrational limitations by limiting Plaintiff to unskilled "simple, routine and repetitive tasks with only occasional contact with the public and coworkers/supervisors" consistent with Dr. Goergen's consultative conclusions (Tr. 20, 23, 537). The modifiers "simple routine, and repetitive," are not inadequate to address moderate concentrational limitations. *Smith-Johnson v. Commissioner of Social Sec.*, 579 Fed.Appx. 426, 436, 2014 WL 4400999, at *10 (6th Cir. September 8, 2014)(same). Thus, Plaintiff's claim that the ALJ rejected the record evidence in favor of her own layperson opinion is without merit.

-25-

Likewise, while Plaintiff was assigned low GAF scores by various sources at different times, the ALJ was not required to credit the scores which reflect only a "snapshot" of Plaintiff's condition at the time of the assessment rather than chronic limitation. *See Sessor v CSS*, 2012 WL 4369071,*7 (E.D. Mich September 25, 2012)(*citing Jordan v. CSS*, 2011 WL 891198, *5 (E.D. Mich. January 14, 2011))("[W]hile GAF scores may be evidence of serious symptoms, '[t]hey are subjective opinions, representing a snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work'"). Moreover, the ALJ noted that the record showed only one episode of decompensation in the recent records (Tr. 24). Because the RFC reflects Plaintiff's degree of limitation as supported by the record as a whole, a remand on this basis is not warranted.

### B. The Condition of Depression

In his second argument, Plaintiff faults the omission of the condition of depression from the Step Two findings. *Plaintiff's Brief* at 24-27. He notes that the record contains numerous references to the condition of depression. *Id.* at 25. He asserts that the administrative decision does not contain any reference to depression *Id.* at 26. He claims that as such "it is impossible to tell whether the ALJ would have assigned additional limitations or credited [the] subjective statements" if she had properly consider the medically determinable condition of depression. *Id.* at 27.

At Step Two, an "impairment or combination of impairments ... [is] found 'not severe' and a finding of 'not disabled' is made ... when medical evidence establishes only a slight

abnormality or [ ] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a de minimis hurdle in the disability determination process.' " *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. February 22, 2008)(*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1998)). "The goal of the test is to 'screen out totally groundless claims.'" *Id.* (*citing Farris v. Secretary of Health & Human Services*, 773 F.2d 85, 89 (6th Cir. 1985)). 20 C.F.R. § 404.1522(a) defines a non-severe impairment as one that does not "significantly limit [the] physical or mental ability to do basic work activities." See also SSR 85-28, supra, at *3. "Basic work activities" include the capacity for "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and, "[d]ealing with changes in a routine work setting." *Id.*

At Step Two, the ALJ found that the conditions of bipolar and anxiety were severe impairments but did not reference the condition of depression (Tr. 17-18). However, Plaintiff's argument that the omission constitutes reversible error fails for multiple reasons. First, his claim that the administrative opinion fails to reference the condition altogether is incorrect. The ALJ noted that as of February, 2014, the condition of depression "seemed to be seasonal . . . and therefore intermittent" (Tr. 23). The ALJ's finding of the severe impairments of bipolar disorder and anxiety (but not depression) appear to be drawn from Dr. Goergen's identical findings (Tr. 537). However, the ALJ's summation of Plaintiff's

psychological history includes the records noting a diagnosis of depression (Tr. 24, 1040).

Moreover, assuming both that the condition of depression caused more than minimal work-related impairments *and* the determination did not contain any reference to depression, the failure to acknowledge an impairment at Step Two is harmless error provided that limitations stemming from the condition are addressed at the remaining steps of the sequential analysis. *Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Fisk v. Astrue*, 253 Fed.Appx. 580, 583-584, 2007 WL 3325869, *4 (6th Cir. November 9, 2007). While the conditions expected to cause workplace limitation "were not deemed to be severe at Step Two," the omission is "legally irrelevant" so long as they are factored in at the remaining steps of the analysis. *Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. February 22, 2008)(*citing Maziarz* at 244).

*Anthony* is applicable here. At Step Three, the ALJ found that Plaintiff's degree of psychological limitation did not meet the listed impairment for an affective disorder, the listing for which includes *both* depression and bipolar disorder (Tr. 18); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04. Likewise, the RFC for a limitation to simple, routine and repetitive tasks adequately addresses the degree of limitation caused by depression (Tr. 20). *See Buczynski v. CSS*, 2017 WL 2888574, at *5 (E.D.Mich. June 15, 2017)(*citing Smith–Johnson*, *supra,* 579 Fed. Appx. at 437)(same). Finally, while the medical records make some reference to Plaintiff's various degrees of depression, it is used in reference to both the independent condition of depression and also in the context of Plaintiff's oft-

diagnosed condition of bipolar disorder which is marked by periods of depression.  Given that the ALJ considered the applicable listing at Step Three, then composed an RFC addressing limitations created by the condition,  Plaintiff fails to show how a finding that he experienced the severe impairments of bipolar disorder, anxiety, *and* depression (rather than just bipolar disorder and anxiety) would change the analysis.

### C.  The "Credibility" Assessment

In his final argument, Plaintiff faults the ALJ for failing to acknowledge his "strong work history" in finding that his allegations of disability were not supported by the record.[10] *Plaintiff's Brief* at 28-30.   He cites *White v. Commissioner of Social Sec.*, 312 Fed.Appx. 779, 789, 2009 WL 454916 (February 24, 2009) in support of his contention that his work experience ought to have been considered in evaluating his claims.  *Id.* at 29 (claimant's "extensive work history and attempts to continue working despite his disability support his credibility")

SSR 16-3p applies to the evaluation of a claimant's subjective allegations in administrative determinations made on or after March 28, 2016 including the current administrative decision of June 10, 2016.   In contrast to the superceded Ruling (SSR 96-7p), the newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p,

---

[10]While neither SSR 16-3p or SSR 96-8p require consideration of a claimant's work history, SSR 96-8p states that "[e]vidence from attempts to work" should be considered among other factors in crafting the RFC.  1996 WL 374184, at *5 (July 2, 1996).

2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." *Id.* at *1-3; *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929. SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process. *Id.* at *3. First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.* at *3. Next, the ALJ evaluates the claims of limitation not reflected in the objective evidence. *Id.* at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.[11]

Plaintiff's claim that the ALJ did not consider his work history is flatly contradicted by the ALJ's paragraph-long summary of his work activity between 2000 and 2011 in the

---

[11]

In addition to an analysis of the medical evidence, 20 C.F.R. §§ 404.1529(c)(3), 416.929 list the factors to be considered in making a credibility determination:

(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

section of the determination devoted to evaluating the allegations of limitation (Tr. 21). Moreover, the ALJ's rejection of the disability claim is otherwise well supported by the record. She acknowledged that Plaintiff experienced some degree of psychological limitation, but observed that Plaintiff's daily activities included going to the gym four to five days a week and riding his bike (Tr. 22). She noted that while Plaintiff reportedly forced himself to participate in these activities to ward off depression, he was also capable of driving himself to doctors' appointments on a regular basis and shopping for groceries (Tr. 22). She cited treating records noting that he denied depression or sadness and consistently exhibited full orientation and a pleasant, cooperative demeanor (Tr. 22). The ALJ's analysis of Plaintiff's claims is consistent with my own review of the records for treatment of the physical conditions showing that he demonstrated good social and concentrational skills[12] (Tr. 874, 876). Because the ALJ's rejection of Plaintiff's allegations of limitation is supported by substantial evidence and well articulated, it should not be disturbed. *See Cruse v. CSS*, 502 F.3d 532, 542 (6th Cir. 2007) (*citing Walters v. CSS*, 127 F.3d 525, 531 (6th Cir. 1997))(an ALJ's determination of the relative credit apportioned to claimant's allegations and other evidence entitled to "great weight").

Accordingly, because the ALJ's decision was generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by

---

[12]I note that while the ALJ devoted a significant portion of her analysis to the allegations of physical problems, Plaintiff later abandoned any claims of disability based on physical limitation (Tr. 264).

this Court. *Mullen v. Bowen, supra.*

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Dock. #17] be GRANTED and that Plaintiff's Motion for Summary Judgment [Dock. #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 23, 2018          s/R. Steven Whalen
                                R. STEVEN WHALEN
                                UNITED STATES MAGISTRATE JUDGE

---

## CERTIFICATE OF SERVICE

I hereby certify on August 23, 2018 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on August 23, 2018.


                                s/Sandra Osorio
                                Acting Case Manager for the
                                Honorable R. Steven Whalen

-33-